**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re Application of FORENSIC NEWS LLC and SCOTT STEDMAN for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | Case No. 22-mc-00229 |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' *EX PARTE*
APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND.................................................................................................5

    I.    Forensic News Investigates And Publishes Reports Highlighting Soriano's
          Connections To Russian And Israeli Elite Implicated In Russian Efforts To
          Interfere With The 2016 U.S. Presidential Election .......................................................5

    II.   Soriano Threatens Petitioners With Litigation And Ultimately Sues Them In
          England Despite Their Lack Of Any Connections To That Forum ...............................8

    III.  Petitioners Successfully Apply For Discovery From Former USG Employee
          Richard Frankel And From Soriano Associate Aviram Azari.....................................11

    IV.  Petitioners Now Seek Discovery From Soriano Associate And USG Contractor
          Mark Rossini. ..............................................................................................................12

LEGAL STANDARD...........................................................................................................14

ARGUMENT .......................................................................................................................15

    I.    Petitioners' Application Satisfies The Statutory Requirements For Discovery
          Pursuant To 28 U.S.C. § 1782 ...................................................................................15

    II.   The *Intel* Discretionary Factors All Favor Granting Petitioner's Application..............17

    III.  It Is Routine And Proper To Grant Petitioners' Application *Ex Parte* ........................23

CONCLUSION.....................................................................................................................24

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*In re 000 Promneftstroy*,
134 F. Supp. 3d 789 (S.D.N.Y. 2015)...............................................................19

*In re Accent Delight Int'l Ltd.*,
791 F. App'x 247 (2d Cir. 2019) .....................................................................21

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017)..............................................................................16

*In re Batbold*,
2021 WL 4596536 (S.D.N.Y. Oct. 6, 2021).....................................................19

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998)................................................................ 14, 15, 21

*In re Bloomfield Inv. Res. Corp.*,
2018 WL 6418421 (E.D.N.Y. Dec. 6, 2018)....................................... 16, 18, 19

*In re BNP Paribas Jersey Tr. Corp.*,
2018 WL 895675 (S.D.N.Y. Feb. 14, 2018) ....................................................20

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012)................................................................................20

*In re Chodiev*,
2021 WL 3270042 (S.D.N.Y. July 30, 2021)...................................................19

*In re Del Valle Ruiz*,
342 F. Supp. 3d 448 (S.D.N.Y. Oct. 19, 2018), *aff'd* 939 F.3d 520 (2d Cir.
2019) ..................................................................................................................14

*In re Doosan Heavy Indus. & Constr. Co.*,
2020 WL 1864903 (E.D.N.Y. Apr. 14, 2020)........................................... 22, 24

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995)............................................................... 18, 19, 23

*Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*,
27 F.4th 136 (2d Cir. 2022)..............................................................................20

*In re G2A.com*,
412 F. Supp. 3d 145 (E.D.N.Y. 2019) ..............................................................24

*Goenechea v. Davidoff*,
2016 WL 560689 (D. Md. Feb. 11, 2016).............................................................3, 21

*In re Gorsoan Ltd. & Gazprombank OJSC*,
2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014)..............................................................19

*Gushlak v. Gushlak*,
486 F. App'x 215 (2d Cir. 2012)..........................................................................4, 24

*In re Hornbeam Corp.*,
722 F. App'x 7 (2d Cir. 2018)...................................................................................24

*In re Pishevar*,
439 F. Supp. 3d 290 (S.D.N.Y. 2020)........................................................................16

*Intel Corp v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ....................................................4, 14, 15, 17, 18, 19, 21

*In re JSC BTA Bank*,
577 F. Supp. 3d 262 (S.D.N.Y. 2021)..............................................................5, 19, 24

*In re Kreke Immobilien KG*,
2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013) .............................................................20

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus*,
62 F. Supp. 3d 358 (S.D.N.Y. 2014) .........................................................................19

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015).................................................................16, 17, 21, 23

*Minatec Fin. S.À.R.L. v. SI Grp. Inc.*,
2008 WL 3884374 (N.D.N.Y Aug. 18, 2008)..............................................................20

*Nat'l Broad. Co. v. Bear Stearns & Co., Inc.*,
165 F.3d 184 (2d Cir. 1999).....................................................................................24

*In re Operacion y Supervision de Hoteles, S.A. de C.V.*,
2015 WL 82007 (S.D.N.Y. Jan. 6, 2015)....................................................................18

*Pfaff v. Deutsche Bank AG*,
2020 WL 3994824 (S.D.N.Y. July 15, 2020)..............................................................24

*Trout Point Lodge, Ltd. v. Handshoe*,
729 F.3d 481 (5th Cir. 2013).......................................................................................2

*United States v. Apfelbaum*,
445 U.S. 115 (1980) ................................................................................................23

*In re Vale S.A.*,
  2020 WL 4048669 (S.D.N.Y. July 20, 2020)......................................................................19

*In re YS GM Marfin II LLC*,
  2022 WL 624291 (S.D.N.Y. Mar. 2, 2022).........................................................................18

**Statutes**

28 U.S.C. § 1782.......................................................................................................................16

28 U.S.C. § 4101.........................................................................................................................2

**Other Authorities**

Press Release, U.S. Dep't of Justice, *Former Governor of Puerto Rico Arrested in
  Bribery Scheme* (Aug. 4, 2022), https://www.justice.gov/opa/pr/former-
  governor-puerto-rico-arrested-bribery-scheme.................................................................22

Findings to Pub. L. 111-223, § 2, 124 Stat. 2380 (2010).........................................................2

**Rules**

Fed. R. Civ. P. 26.....................................................................................................................21

N.Y. Civ. Rights Law § 76-a ...................................................................................................23

# INTRODUCTION

Forensic News LLC and its journalist-founder Scott Stedman (together, "Petitioners")

seek this Court's leave under 28 U.S.C. § 1782 to take discovery in aid of their defense of a

defamation action filed in England by British-Israeli "security consultant" Walter Soriano. *See*

*Soriano v. Forensic News LLC*, Claim No. QB-2020-002450 (the "English Defamation Action").

In the English Defamation Action, Soriano claims Petitioners should be held liable for statements

made in a series of articles they published discussing associations between Soriano and his

security consultancy firm USG Security Limited ("USG"), on the one hand, and core figures

associated with alleged Russian interference in the 2016 U.S. presidential election, on the other.

Petitioners have already successfully sought discovery pursuant to Section 1782 to aid

their defense in England. In this third Section 1782 application arising from the English

Defamation Action, Petitioners seek discovery from Mark Rossini, a former FBI agent who

worked for USG and likely has relevant knowledge regarding the relationships Forensic News

reported on between Soriano and Russian oligarchs who may have played a role in election

interference. Rossini also likely possesses documents that will lead to the discovery of

additional, highly probative evidence regarding payments USG has made to shadowy individuals

and entities on behalf of these Russian oligarchs. Petitioners anticipate that Rossini's testimonial

and documentary evidence will significantly assist them in their efforts to defeat Soriano's

English case, which is a paradigmatic strategic lawsuit against public participation ("SLAPP").

That discovery will help Petitioners vindicate the Forensic News reporting that is at the heart of

that case.

Forensic News is an investigative journalism platform whose mission is to deliver

original long-form reporting focused on national security, espionage, corporate, and political

issues. Walter Soriano is a British-Israeli "security consultant" with ties to the Russian oligarchy. Forensic News learned of Soriano when a *Politico* report identified him as a person of interest in the Senate Intelligence Committee's investigation into Russian interference in the 2016 U.S. presidential election. Forensic News picked up on the *Politico* report and ran with it. Forensic News and its journalists ultimately discovered and reported on a web of shadowy connections and secretive dealings that were largely forged through USG. Their investigations culminated in the publication of multiple news articles about Soriano and his ties to core figures associated with alleged Russian election interference, including Dmitry Rybolovlev and other Russian oligarchs.

Although Forensic News is based in the United States, is staffed by American journalists, and reports on issues of concern to the American public (its primary audience), Soriano cracked open the well-worn playbook of foreign oligarchs unwilling to face the crucible of a full and fair American-style press. He sued Forensic News, Mr. Stedman, and other contributing journalists in England—a jurisdiction that has far less robust speech protections than the United States. As Congress has observed, such "libel tourism" is intended to "'obstruct[]' the free expression rights of domestic authors and publishers" and "'chill[]' domestic citizens' First Amendment interest in 'receiving information on matters of importance.'" *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 487 (5th Cir. 2013) (quoting Findings to Pub. L. 111-223, § 2, 124 Stat. 2380 (2010)). Congress has ensured that any judgment Soriano procures will ultimately be unenforceable in the United States through the Securing Protection of Our Enduring and Established Constitutional Heritage ("SPEECH") Act of 2010. The SPEECH Act broadly renders unenforceable foreign judgments for defamation or associated claims, particularly strike suits like Soriano's that are designed to chill reporting on matters of public concern. *See, e.g.*, 28 U.S.C. § 4101 *et. seq.*

But even if any judgment against Petitioners will be unenforceable in the United States, the English Defamation Action is ongoing. Petitioners therefore seek discovery from this Court to aid them in their defense. *See Goenechea v. Davidoff*, 2016 WL 560689, at *3 (D. Md. Feb. 11, 2016) (granting Section 1782 application despite possibility that foreign judgment would be unenforceable under the SPEECH Act). The discovery Petitioners seek pertains to two critical components of their defense of the English Defamation Action. *First*, Petitioners can defeat Soriano's claims on the merits if they prove their reporting was truthful and accurate. *Second*, Petitioners will likely have the opportunity to cross-examine Soriano at trial in England, putting his credibility at issue. Any evidence that allows Petitioners to challenge Soriano's credibility would plainly aid in Petitioners' defense.

This is Petitioners' third Section 1782 application arising out of the English Defamation Action. Petitioners' first application sought discovery from former FBI agent and USG employee Richard Frankel. Judge Matsumoto in the Eastern District granted that application in April, *see In re Forensic News LLC, et al.*, No. 1:22-mc-00993, ECF No. 11 (E.D.N.Y. Apr. 4, 2022) (Matsumoto, *J.*), and Petitioners deposed Frankel in May. Petitioners' second application seeks discovery from Aviram Azari, an Israeli private intelligence veteran whom Soriano engaged on behalf of USG clients to undertake cyber-intelligence operations. Magistrate Judge Taryn Merkl in the Eastern District granted that application on August 16, 2022. *See In re Forensic News LLC, et al.*, No. 1:22-mc-01617, ECF No. 13 (E.D.N.Y. Aug. 16, 2022) (Merkl, *M.J.*).

In this new proceeding, Rossini likely possesses additional unique evidence that will aid Petitioners' defense in the English Defamation Action. Rossini's tenure at USG spanned years and covered some of the most critical events described in Petitioners' articles—events Soriano

denies ever occurred. Rossini—as a USG contractor—also likely possesses contracts or

paystubs that could help Petitioners discover additional evidence corroborating the truth of their

reports on USG's business relationships. This corroboration is critical to Petitioners' defense in

the English Defamation Action. It will help confirm the truth and accuracy of Forensic News's

reporting and defeat Soriano's blanket denials of the facts Petitioners uncovered.

This Court should grant Petitioners' *ex parte* application for three reasons.

*First*, this application meets each of the statutory prerequisites articulated in *Intel Corp. v.*

*Advanced Micro Devices, Inc.*, 542 U.S. 241, 246–47 (2004). Petitioners are defendants in a

foreign action, seek discovery from an individual who resides or is found in this judicial district,

and seek discovery for use in a foreign proceeding. Rossini resides in Rye, New York, and

Petitioners will use the discovery they obtain from Rossini to defend against Soriano's claims in

the English tribunal.

*Second*, each of the discretionary factors articulated in *Intel* favors awarding discovery.

*Id.* at 264–65. Rossini is not party to the English Defamation Action, the English tribunal is

receptive to U.S. judicial assistance, this application does not seek to circumvent any English

proof-gathering restrictions, and the discovery sought will not be unduly burdensome. These

factors apply exactly the same way they did in Petitioners' recent, successful Section 1782

application before Judge Matsumoto. In that case, the Court granted the application in full.

Petitioners respectfully ask this Court to do the same.

*Third*, courts in this district and others routinely grant Section 1782 applications on an *ex*

*parte* basis. *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012). Granting *ex parte*

relief will not deny Rossini the opportunity to be heard, as he "will have the opportunity to

challenge [Petitioners'] subpoenas once served." *In re JSC BTA Bank*, 577 F. Supp. 2d 262, 268

(S.D.N.Y. 2021). This Court should therefore grant Petitioners' *ex parte* application.

## FACTUAL BACKGROUND

### I. Forensic News Investigates And Publishes Reports Highlighting Soriano's Connections To Russian And Israeli Elite Implicated In Russian Efforts To Interfere With The 2016 U.S. Presidential Election

Forensic News is an independent news outlet based in the United States that covers

national security and intelligence issues across the world. Declaration of Patrick Doris ("Doris

Decl.") ¶ 4. Scott Stedman founded Forensic News in April 2019 to provide free access to well-

sourced, long-form investigative journalism. *See* Ex. 2 at 1–3.[1] Stedman is an investigative

journalist whose work has been cited in the *Washington Post*, BBC, CNN, *The Guardian*, and

VICE. *See* Ex. 3 at 1.

Forensic News first became interested in Walter Soriano after he was invited to testify

before the U.S. Senate Intelligence Committee about potential Russian interference with the

2016 presidential election. *See* Ex. 4 at 6; Ex. 5 at 2. In April 2019, the Senate Intelligence

Committee requested an interview and documents relating to any communications Soriano had

with over a dozen individuals and companies, including Russian oligarch Oleg Deripaska,

General Michael Flynn, Paul Manafort, and Steve Bannon. *See* Ex. 4 at 6–7; Ex. 5 at 2. Soriano

never responded to the Committee's request. *See* Ex. 4 at 51.

Shortly thereafter, Forensic News began publishing a series of articles about Soriano.

The reporting was groundbreaking. Over the course of its reporting series, Forensic News

uncovered Soriano's deep ties to the power centers of the Israeli and Russian governments. *See*

---

[1] "Ex." refers to the exhibits attached to the Declaration of Anne Champion, filed in conjunction with this application.

Ex. 4 at 4, 9–11. These connections, usually forged through Soriano's private security firm USG, *see* Ex. 6 at 2–3, became the focus of Forensic News's reporting.

In the first articles in its series, Forensic News detailed Soriano's extensive relationships with Russian oligarchs and their agents, including, most prominently, Oleg Deripaska. Deripaska is an aluminum magnate with close ties to Russian president Vladimir Putin and Paul Manafort and was the subject of intense scrutiny for his involvement in Russian election interference activities. *See* Ex. 4 at 44, 58, 65. In 2018, the U.S. Treasury Department imposed sanctions on Deripaska and his company, explaining that he had "benefit[ted] from the Putin regime and play[ed] a key role in advancing Russia's malign activities." *See* Ex. 7 at 1. Forensic News discovered through Russian court documents that Deripaska's aviation company contracted with Soriano's USG to give USG "direct control" of the Sochi International Airport during the Sochi Winter Olympics in 2014. *See* Ex. 4 at 4. As one of Forensic News's sources explained, "airport security during the Olympics is an extremely sensitive issue . . . . [s]o, it sounds like the Kremlin very much trusted USG Security." *See id.* at 6. The same source noted that "consulting" contracts like the one between Deripaska's company and USG "[are] a standard way to hide kickbacks and other corrupt payments." *See id.*

Forensic News reported other ties between Soriano and Deripaska. For example, Forensic News detailed the story of Nastya Rybka. Rybka is a Belarusian woman who was in a romantic relationship with Deripaska. In 2018, she claimed to have audiotapes showing coordination between the Trump campaign and Russia. *See id.* at 57–58. After she published a video of Deripaska discussing U.S. relations with the Russian Deputy Prime Minister, Rybka was arrested in Thailand and extradited back to Russia. Once home, she was forced to publicly apologize to Deripaska. *See id.* at 58. As Forensic News reported, Soriano assisted Deripaska in

his efforts to obtain and conceal sensitive materials that Rybka possessed, including other recordings. *See id.*

Forensic News's articles also described Soriano's connections to Dmitry Rybolovlev, another oligarch and one of the wealthiest people in Russia. *See id.* at 8. Forensic News reported that Rybolovlev hired Soriano to assist with multiple legal disputes in and around 2016, including one dispute with Swiss banker and art dealer, Yves Bouvier. *See id.* at 8–9; *see also* Ex. 8 at 5. Rybolovlev separately hired USG in mid-2016 to investigate a former coach and player of his soccer club, AS Monaco. *See* Ex. 4 at 8. Based on a court filing from Israeli journalist Ravi Drucker (whom Soriano unsuccessfully sued for libel), Forensic News reported that Soriano offered Rybolovlev "sophisticated tracking, data collection and data acquisition through various technological means, such as hacking, eavesdropping, and more." *See id.*

Beyond exposing Soriano's ties to the Russian elite, Forensic News detailed Soriano's connections to high-ranking Israeli government officials and intelligence officers. For instance, Forensic News reported, based in part on a 2018 Israeli news exposé, that Soriano had been a confidant of former Israeli Prime Minister Benjamin Netanyahu for decades. *See id.* at 3. Forensic News also reported, based on testimony from a July 2019 Israeli court proceeding, that Soriano had once claimed Netanyahu was a "partner" in USG. *See id.* at 10. In addition to these direct ties to Netanyahu, Forensic News reported that Soriano had a business relationship with Isaac Molho, Netanyahu's longtime confidant and attorney. *See id.* Indeed, documents obtained by Forensic News revealed that Molho owned a portion of USG. *See id.* Another document, first published by Drucker, showed that USG paid Molho almost $200,000 in finder's fees for a contract Molho facilitated with the Mexican steel company Altos Hornos de Mexico.

*See id.* Soriano later orchestrated a meeting between the Chairman of AHMSA and Netanyahu. *See id.*

In sum, Petitioners' reporting was dogged and thorough. They exposed significant and suspicious webs of contacts all linked through Soriano and USG. And they raised serious questions on significant matters of public concern. Petitioners' reporting represented the best of traditional, shoe-leather investigative journalism—the very type of journalism the First Amendment was meant to protect.

## II. Soriano Threatens Petitioners With Litigation And Ultimately Sues Them In England Despite Their Lack Of Any Connections To That Forum

As Forensic News revealed more of Soriano's relationships with individuals and entities tied to Russian election interference activities, Soriano contacted Petitioners through counsel. He threatened to sue Forensic News and its journalists. *See* Ex. 4 at 53. And he demanded they cease their reporting. *See id.* at 32. Soriano's tactics were not new; he has repeatedly attempted to use litigation to silence journalists in the past. By way of example, Soriano brought libel claims against two investigative journalists and multiple Israeli publications in Israeli court. *See id.* at 63; Ex. 9 at 2. He challenged reports that he spearheaded efforts to collect compromising information on police investigators who were investigating then-Prime Minister Netanyahu. The journalists ultimately prevailed. *See* Ex. 4 at 67. Soriano also sued Twitter for hosting news stories he perceived as unflattering. *See id.* at 62.

Despite Soriano's threats, Forensic News stood by its reporting. It refused to be intimidated. And it declined either to cease its reporting or to self-censor by taking down its groundbreaking pieces.

On July 14, 2020, Soriano initiated legal proceedings in the High Court of Justice, Queen's Bench Division, in London. Doris Decl. ¶ 8. Soriano named as defendants Forensic

News and four contributing journalists (including Mr. Stedman) who are American citizens and reside in the United States. *Id.* ¶¶ 4, 5, 7.[2] He asserted claims for data protection under the General Data Protection Regulation ("GDPR"), malicious falsehood, harassment, misuse of private information, and libel. *Id.* ¶ 8; *see generally* Ex. 10. Soriano sought not only injunctive relief but also monetary damages, including "aggravated damages." *See* Ex. 10 at 29.

Soriano's claims focused primarily on six investigative articles and podcasts that Petitioners authored, published, or participated in between 2019 and 2020. *See supra* at 5–8; Doris Decl. ¶ 8. According to Soriano, the publications falsely stated or implied (among other things) that he (i) was involved in a Russian conspiracy to interfere with the 2016 U.S. presidential election; (ii) served as a middleman between Russia and a network of Israeli hacking and surveillance firms; (iii) engages in money laundering through Playland Investments, LLC, a real estate venture in Florida; and (iv) makes or has made illegal arrangements for Russian oligarchs, including Deripaska and Rybolovlev, and for former Prime Minister Netanyahu. *See* Ex. 10 ¶¶ 11–12, 22, 29. Soriano categorically denied, for example, that he had ever "paid off a Russian sex worker [*i.e.*, the Belarusian woman Nastya Rybka] who threatened to release an audio tape of her relationship with Oleg Deripaska." *See id.* ¶¶ 12, 29.

Because Petitioners reside in the United States, Soriano had to apply for the High Court's permission to serve them in the United States. *See* Doris Decl. ¶ 9. Petitioners opposed the application, arguing that the High Court lacked jurisdiction. *Id.* ¶ 10. On January 15, 2021, the High Court issued a judgment denying Soriano permission to serve Petitioners with his claims for GDPR violations, malicious falsehood, and harassment. *See id.* ¶ 11. The Court concluded that Soriano failed to demonstrate a real prospect of success on any of these claims, and that

---

[2] Soriano also brought claims against Richard Silverstein, a journalist unaffiliated with Forensic News.

certain claims were "based on little more than wild speculation." Ex. 11 ¶¶ 69, 96–99, 103. But the High Court allowed Soriano to serve Petitioners in the United States with claims for libel and misuse of private information. *See* Doris Decl. ¶ 11; *see also* Ex. 11 ¶¶ 164, 169. The High Court also concluded that the courts of England and Wales were the appropriate forum for trial of these claims. Ex. 11 ¶ 164.

The parties cross-appealed. *See* Doris Decl. ¶ 12. On December 21, 2021, the Court of Appeal affirmed the High Court's decision to let Soriano serve his claims for libel and misuse of private information. *See id.*; Ex. 12 ¶¶ 71–72, 123. It also reversed the High Court's dismissal of the GDPR data protection claim, holding, based on the preliminary record, that Forensic News's activity fell within the territorial scope of the GDPR. *See* Doris Decl. ¶ 12; Ex. 12 ¶¶ 95, 103–04, 123. The appellate court's ruling on the GDPR claim has been called a "landmark." Because Forensic News's connections to the United Kingdom and the European Union are so sparse, commentators have noted that subjecting Forensic News to the GDPR's territorial reach "will have far-reaching implications for all US media corporations." Ex. 13 at 1. As Soriano's counsel proclaimed, the appellate decision "is of historic importance to all US media: if you publish an article about a UK citizen, even if you are physically only based in the US, you may be sued in the UK for breach of data protection laws." Ex. 14 at 1.

Merits proceedings on Soriano's three remaining claims against Petitioners are underway.[3] Those claims include Soriano's assertions that Petitioners committed libel, misused private information, and violated the GDPR. Doris Decl. ¶¶ 12, 14. Relevant to this application, Petitioners can defeat Soriano's claims in the English Defamation Action by demonstrating that

---

[3] In June, Soriano settled his claims against two of the journalist defendants. His claims against Petitioners, however, remain pending.

the statements contained in their reporting were true and accurate.  *See* Doris Decl. ¶¶ 25, 27.

Under English law, there is a presumption that an allegedly libelous statement is false—meaning

that the *defendant* has the burden of proving otherwise.  *Id.* ¶ 27.  Accordingly, Petitioners will

have the evidentiary burden of proof with respect to their truth defense.  *Id.* ¶¶ 27, 34–35.

Petitioners also expect Soriano to testify at trial in the English Defamation Action and to deny

the allegations made in Forensic News's reporting.  *Id.* ¶ 29.  Soriano's credibility will therefore

be directly at issue, and Petitioners will have a greater chance of success if they can persuade the

High Court not to believe Soriano's testimony following vigorous cross-examination.  *Id.*

Petitioners' Defence in the English Defamation Action was filed on March 16, 2022.

They will soon enter the discovery phase of the litigation.  They now submit this Section 1782

application to aid in their defense and are considering making additional applications.

### III.  Petitioners Successfully Apply For Discovery From Former USG Employee Richard Frankel And From Soriano Associate Aviram Azari.

On March 31, 2022, Petitioners filed in the U.S. District Court for the Eastern District of

New York their first application under 28 U.S.C. § 1782 for leave to conduct discovery for use in

the English Defamation Proceeding.  *See* Ex. 15 at 6.  Petitioners sought discovery from Richard

Frankel, a former FBI agent whom Soriano hired in 2016 to establish a U.S. presence for USG.

*See id.* at 11; Ex. 16 at Tr. 32:4–16, 21–25.  On April 4, 2022, Judge Matsumoto held that

Petitioners satisfied the relevant factors under Section 1782 and granted Petitioners leave to take

discovery from Frankel.  Ex. 17 at 1–2.  On May 24, 2022, Petitioners' counsel deposed Frankel.

Frankel testified about his employment at USG, USG's work for Rybolovlev in the art dispute

case, and Soriano's connections to Former Prime Minister Netanyahu.  *See generally* Ex. 16.

Frankel identified Mark Rossini as the individual who introduced Frankel to Soriano in late

2015, *see id.* at 25:20–23, 32:17–20, and testified that Rossini did contract work for USG, *id.* at

47:20; *see also id.* at 64:15–22 (identifying Rossini as someone "associated with USG"). Frankel testified that "if there was anyone" else at USG who performed work on the Rybolovlev matter, it "would have" been Rossini. *Id.* at 48:9–16.

On May 25, 2022, Petitioners filed in the U.S. District Court for the Eastern District of New York their second application under 28 U.S.C. § 1782 for leave to conduct discovery for use in the English Defamation Proceeding. *See* Ex. 18 at 6. Petitioners sought discovery from Aviram Azari, an Israeli private detective who has reportedly connected Soriano with cyber-espionage and surveillance firms to serve Soriano's clients. *See id.* at 11. Soriano and Azari have reportedly worked together for a decade, including on matters for Rybolovlev, Deripaska, and other oligarchs. *See id.* Azari has since been convicted of "wire fraud, identity theft and hacking-related charges after hiring Indian spies to target 'a large number' of people." Ex. 20 at 12. The Eastern District granted Petitioners' application on August 16, 2022. *See* Ex. 19 at 1–2.

## IV. Petitioners Now Seek Discovery From Soriano Associate And USG Contractor Mark Rossini.

Respondent Mark Rossini likely possesses additional information that will assist Petitioners in defending against the English Defamation Action.

Rossini worked for the FBI from 1991 through 2008. *See* Ex. 21 at 1; Ex. 22 at 1. In January 2007, Rossini reportedly improperly downloaded a confidential informant's report and shared it with a close personal contact (who in turn shared it with the defendant in an ongoing prosecution). *See id.* at 2. When the Department of Justice interviewed Rossini about this incident, he reportedly falsely denied having obtained any FBI information without authorization. *Id.* Rossini ultimately pleaded guilty to five separate counts of criminally accessing a sensitive FBI database for personal purposes. *Id.* at 1. He resigned from the FBI in November 2008 as part of his plea agreement. *Id.*

Sometime after his departure from the FBI, Rossini began working at USG. *See* Ex. 16 at Tr. 25:4–23.[4] Although Rossini maintained—and continues to maintain—a residence in New York, *see* Ex. 23 at 1, he was primarily based in Europe while working for USG, *see* Ex. 24 at 3. Unlike Frankel, who primarily worked in the United States, Rossini performed extraterritorial work for USG. *See* Ex. 16 at Tr. 47:16–18 (explaining that while working for USG, Frankel was "by [him]self . . . here in the United States"); *cf. id.* at Tr. 48:12–17 (Rossini was both "in the United States and outside the United States" while working for USG). As Frankel testified, Rossini himself may have performed work for Russian oligarch Dmitry Rybolovlev in the scope of his employment with USG. *See* Ex. 16 at Tr. 47:10–24 (testifying that Rossini "had done contract work" for USG and that he "maybe . . . did some work" on the Rybolovlev matter in 2016). Rossini worked for USG until at least 2018. *See* Ex. 24 at 1, 3.

Rossini's tenure at USG overlaps with several other of the key events described in Petitioners' articles and denied by Soriano. Petitioners reported, for example, that between 2016 and 2018 USG (or Soriano individually) participated in the arrest of Nastya Rybka on behalf of Deripaska, *see* Ex. 4 at 57–58, as well as the investigation of a former coach and player of Rybolovlev's soccer club, AS Monaco, *see id.* at 8. In all events, Rossini likely possesses knowledge and documents regarding USG's financials (including an employment agreement or paystubs) that could lead to highly probative evidence regarding USG payments to entities described in Petitioners' articles.

---

[4] In his deposition, Frankel testified that Rossini introduced Frankel to Soriano in 2015 and that Rossini said USG was seeking to expand its business into the United States. Ex. 16 at Tr. 25:4–23. Rossini appears to have worked for USG at that time.

**LEGAL STANDARD**

Section 1782(a) provides that a federal district court may order discovery for use in a foreign or international tribunal from persons residing or found in the court's judicial district. Section 1782 was designed "to liberalize the assistance given to foreign and international tribunals." *In re Del Valle Ruiz*, 342 F. Supp. 3d 448, 453 (S.D.N.Y. Oct. 19, 2018), *aff'd* 939 F.3d 520 (2d Cir. 2019). Where the information sought is relevant, it is "presumptively discoverable under § 1782." *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998). "Consistent with the statute's modest *prima facie* elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *Id.* at 195.

Section 1782(a) has three *prima facie* statutory requirements. *First*, the applicant must be an "interested person" in the foreign proceeding. *Intel Corp v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004). *Second*, the person from whom discovery is sought must reside in or be found in this district. *Id. Third*, the discovery must be for use in a proceeding in a foreign tribunal. *Id.* When all three requirements are met, the decision to grant the discovery request rests with the district court, whose discretion is guided by four factors the Supreme Court has identified. *Id.* at 260–61, 64–65. Specifically, in considering whether to grant the requested discovery, this Court should consider: (i) whether the person from whom discovery is requested is a party to the foreign proceeding; (ii) the nature of the foreign tribunal, the character of the foreign proceeding, and the tribunal's receptivity to the federal court's assistance; (iii) whether the applicant is attempting to circumvent discovery restrictions or policies of the foreign tribunal; and (iv) whether the discovery sought is unduly intrusive or burdensome. *Id.* at 264–65.

**ARGUMENT**

Petitioners seek discovery from former USG contractor Mark Rossini. USG employed Rossini during many of the events discussed in Petitioners' reporting and challenged by Soriano in the English Defamation Action. USG is at the center of virtually all of Soriano's connections to Deripaska, Abramovich, Rybolovlev, Netanyahu, Molho, and others. Having worked for USG during the relevant time period, Rossini likely possesses information that would prove the accuracy of Petitioners' reporting on these connections. Any such information would support the veracity of Petitioners' reporting on Soriano's vast web of connections. Rossini also likely possesses written agreements or other financial documents that would lead to highly probative evidence regarding payments USG made to individuals affiliated with Russian oligarchs, the Israeli elite, or cyber-surveillance and hacking firms. The discovery would therefore aid Petitioners in defeating the strike suit Soriano filed against them in England—a suit that would not even come close to prevailing in an American court.

As explained in more detail below, this request satisfies each of the enumerated statutory and discretionary factors relevant to assessing whether to award Section 1782 relief. This Court should grant Petitioners' application in full.

**I.      Petitioners' Application Satisfies The Statutory Requirements For Discovery Pursuant To 28 U.S.C. § 1782**

This application easily meets the *prima facie* statutory requirements set forth in Section 1782. *See In re Bayer*, 146 F.3d at 193. We take each in turn.

*1. Petitioners Are Interested Persons.* First, Petitioners are "interested persons" in a foreign proceeding in England. Specifically, they are defendants. As the Supreme Court explained in *Intel*, "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." 542 U.S. at 256. As defendants

in the English Defamation Action, Petitioners are undisputedly "interested person[s]" who can seek Section 1782 discovery.

**2. *Rossini Resides In Or Is Found In This District.*** Second, Rossini resides in or is found within the Southern District of New York. Rossini resides in Rye, New York, which is located in this district. *See* Ex. 23 at 1. Petitioners, therefore, have established the second statutory factor: Rossini resides or is found within this judicial district. *See* 28 U.S.C. § 1782(a); *see also In re Pishevar*, 439 F. Supp. 3d 290, 301 (S.D.N.Y. 2020) (finding respondent to be "located in this district" because he was a "resident of New York"); *In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at *4 (E.D.N.Y. Dec. 6, 2018) (finding that respondent "reside[d] in this district" for purposes of § 1782 where "most recent and current address" was in the district).

**3. *The Discovery Sought Is For Use In A Foreign Proceeding.*** Petitioners satisfy Section 1782's final statutory requirement because they intend to use this discovery in the proceedings against them in the United Kingdom. To meet the "for use in a foreign tribunal" requirement, the applicant must demonstrate the "ability to inject the requested information into a foreign proceeding" and that the "requested discovery is something that will be employed with some advantage or serve some use in the proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017) (internal quotation marks omitted). There is no requirement that the discovery sought should be strictly necessary for the applicant's case, so long as the materials can "increase her chances of success." *Mees v. Buiter*, 793 F. 3d 291, 299 (2d Cir. 2015).

Here, the discovery sought would plainly increase Petitioners' "chances of success" in that proceeding—in fact, it may well be dispositive of certain claims. *See* Doris Decl. ¶¶ 27, 29. One of Petitioners' primary defenses to the claims against them in the English Defamation Action is that none of the statements published in the challenged publications is false. Under

English law, "it is a defence to an action for defamation for the defendant to show that the imputation conveyed by the statement complained of is substantially true." *Id.* ¶ 27 & n.2 (quoting Section 2 of the English Defamation Act ). The discovery Petitioners seek will support the truth of many of the statements in Forensic News's reporting that Soriano challenges in the English Defamation Action. This includes, *inter alia*, that Soriano "makes illegal arrangements for his clients," Ex. 10 ¶ 12.7.1; that Soriano "worked directly for Oleg Deripaska and Israeli Prime Minister Benjamin Netanyahu," *id.* ¶ 12.8.1; and that Soriano "paid off a Russian sex worker who threatened to release an audio tape of her relationship with Oleg Deripaska," *id.* ¶ 12.7.5. The discovery sought will also help Petitioners challenge Soriano's credibility should he be cross-examined at trial in the English Defamation Action. Soriano has offered blanket denials of the claims made in Forensic News's reporting. *Id.* ¶¶ 22.1–22.7. Any facts that damage Soriano's credibility and aid Petitioners' cross-examination will benefit Petitioners' efforts to prevail in the ultimate trial in the English Defamation Action.

\* \* \*

In short and in sum, Petitioners indisputably satisfy the three statutory pre-requisites to awarding Section 1782 relief. Petitioners are defendants in a foreign case, and they seek discovery for use in a foreign proceeding from a resident of this judicial district. This Court should award Section 1782 relief.

## II. The *Intel* Discretionary Factors All Favor Granting Petitioner's Application.

The four discretionary factors the Supreme Court identified in *Intel* also weigh strongly in favor of granting Petitioners' Section 1782 application. *See Intel*, 542 U.S. at 264–65; *Mees*, 793 F.3d at 298. We again address each in turn.

*1. The Discovery Target Is Not A "Participant" In the Foreign Actions.* The first *Intel* factor considers whether "the person from whom discovery is sought is a participant in the

foreign proceeding." *Intel*, 542 U.S. at 264. That factor weighs in favor of granting discovery

here. Rossini is neither a party to nor a participant in the English Defamation Action. *See* Doris

Decl. ¶¶ 4–8. And because Rossini "resides in the United States and is not a party" to the

English Defamation Action, the High Court does not have jurisdiction to "obtain his testimony

[or] any documents sought" from him. *In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at

*4. This factor therefore weighs heavily in favor of granting Petitioners' application. *See id.*;

*see also In re Operacion y Supervision de Hoteles, S.A. de C.V.*, 2015 WL 82007, at *6

(S.D.N.Y. Jan. 6, 2015) ("Because [the subpoena target] is not a party to the [foreign proceeding]

and the foreign tribunal lacks jurisdiction to compel his testimony, analysis of the first *Intel*

suggests that the subpoena should be enforced."); *In re YS GM Marfin II LLC*, 2022 WL 624291,

at *8 (S.D.N.Y. Mar. 2, 2022) ("Because Respondents have not shown that the documents

Applicants seek are within the jurisdictional reach of the English courts, analysis of the first

factor favors granting Applicants' motion.").

  *2. **The English Court Is Receptive to U.S. Discovery Assistance.*** The second *Intel*

factor assesses "the nature of the foreign tribunal, the character of the proceedings underway

abroad, and the receptivity of the foreign government or the court or agency abroad to U.S.

federal-court judicial assistance." *Intel*, 542 U.S. at 264. "Absent specific directions to the

contrary from a foreign forum, [Section 1782]'s underlying policy should generally prompt

district courts to provide some form of discovery assistance." *Euromepa S.A. v. R. Esmerian,

Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995); *see also In re Bloomfield Inv. Res. Corp.*, 2018 WL

6418421, at *5 ("The Second Circuit has instructed district courts to be liberal in permitting

requested discovery."). Courts therefore presume that a foreign forum will be receptive to U.S.

assistance, unless there is "*authoritative proof*" that the foreign forum "would reject evidence

18

obtained with the aid of § 1782." *In re 000 Promneftstroy*, 134 F. Supp. 3d 789, 792 (S.D.N.Y. 2015) (emphasis added) (alteration omitted) (quoting *Euromepa S.A.*, 51 F.3d at 1100); *see also In re Gorsoan Ltd. & Gazprombank OJSC*, 2014 WL 7232262, at *7 (S.D.N.Y. Dec. 10, 2014) ("Where courts have found . . . the second Intel factor weighs against a Section 1782 discovery request, evidence demonstrating the non-receptiveness of the foreign tribunals to U.S. discovery has been explicit.").

The second *Intel* factor again clearly favors Petitioners. The High Court is amenable to accepting evidence procured through U.S. discovery mechanisms. *See* Doris Decl. ¶¶ 30–33. In fact, federal district courts have consistently found that "the courts in the United Kingdom . . . are [] receptive to Section 1782 discovery." *In re Batbold*, 2021 WL 4596536, at *4 (S.D.N.Y. Oct. 6, 2021); *see also, e.g.*, *In re JSC BTA Bank*, 577 F. Supp. 3d at 268; *In re Chodiev*, 2021 WL 3270042, at *2 (S.D.N.Y. July 30, 2021); *In re Vale S.A.*, 2020 WL 4048669, at *4 (S.D.N.Y. July 20, 2020); *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 362 (S.D.N.Y. 2014). And "the regularity with which U.S. courts grant similar Section 1782 discovery requests for [English] litigation . . . suggests that there is little potential offensiveness to such grants." *In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at *6.

**3. *No Attempt to Circumvent Foreign Proof-Gathering Restrictions.*** The third *Intel* factor examines "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. An applicant attempts to "circumvent" foreign proof-gathering restrictions only when it "uses a § 1782 application to avoid measures that are *intended* to restrict certain means of gathering or using evidence." *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 153 (2d Cir. 2022); *see also id.* at 154–55 (holding that a U.S.-Nigeria treaty did not qualify

as such a measure). This factor similarly weighs in favor of granting Petitioners' discovery application.

Importantly, the third *Intel* factor is "not the same as a foreign discoverability requirement." *In re Kreke Immobilien KG*, 2013 WL 5966916, at *6 (S.D.N.Y. Nov. 8, 2013), *abrogated on other grounds by In re Del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019). "Courts may grant § 1782 applications even where the applicant did not first seek discovery in the foreign tribunal . . . or where the information sought was not discoverable under the laws of the foreign country at issue in the foreign proceeding." *In re BNP Paribas Jersey Tr. Corp.*, 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018). Moreover, the requested discovery need not be admissible abroad. *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012). Rather, when evaluating the third *Intel* factor, courts consider whether the petitioner seeks the discovery in good faith. *Minatec Fin. S.À.R.L. v. SI Grp. Inc.*, 2008 WL 3884374, at *8 (N.D.N.Y Aug. 18, 2008).

Here, Petitioners make their discovery requests in a good-faith effort to obtain information essential to one of their main defenses in the English Defamation Action: Petitioners' reporting about Soriano was truthful and accurate. Evidence substantiating that defense would help Petitioners defeat both the libel and GDPR claims pending against them. Doris Decl. ¶¶ 26–28, 37. Petitioners' discovery requests seek information located in this district (or at least under Mr. Rossini's control) regarding work performed by Soriano and his security firm USG—the specific topics covered in Petitioners' reporting and disparaged as "libel" by Soriano.

The United Kingdom does not have any law or policy that would bar such relevant evidence. *See id.* ¶ 33. To the contrary, if Rossini were subject to the High Court's jurisdiction

(and to Petitioners' knowledge he is not), Petitioners likely could have obtained their requested

discovery from him in England. *Id.* ¶¶ 19–24. In any event, even if Petitioners could not have

obtained this discovery directly in the English proceeding, this factor would still favor Petitioners

because "'[t]here is no reason to assume that because a country has not adopted a particular

discovery procedure, it would take offense at its use.'" *Intel*, 542 U.S. at 261 (quoting *In re*

*Bayer*, 146 F.3d at 194); *see also In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 251 (2d Cir.

2019). Once again, the third *Intel* factor strongly favors Section 1782 relief here.

> ### 4. The Requested Discovery is Relevant and Not Unduly Burdensome. The fourth *Intel*

factor examines whether the request is "unduly intrusive or burdensome." *Intel Corp.*, 542 U.S.

at 265. "[A] district court evaluating a § 1782 discovery request should assess whether the

discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule

26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302. That is, the Court should

consider factors including "the parties' relative access to relevant information, the parties'

resources, the importance of the discovery in resolving the issues, and whether the burden or

expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).[5]

Here, the discovery sought is unquestionably relevant to the English Defamation

Proceeding. It bears directly on the truth and accuracy of Petitioners' reporting—the most

critical issue in the English Defamation Proceeding—and on Soriano's credibility. *See supra*

16–17. Rossini worked at USG during the key events reported by Petitioners, including the

Nastya Rybka affair and the Rybolovlev investigation of individuals associated with AS Monaco

---

[5] That any ultimate English judgment will be unenforceable in the United States under the SPEECH Act does not render discovery inappropriate. *See Goenechea*, 2016 WL 560689, at *3 (granting Section 1782 application even though ultimate foreign judgment was likely unenforceable pursuant to the SPEECH Act). The SPEECH Act only affects judgments enforced *in* the United States. Petitioners have a right to attempt to defend the English Defamation Action to prevent the imposition of a judgment that might be enforceable elsewhere.

(and potentially others).  As Frankel testified, Rossini may have performed work on the Rybolovlev art dispute that Petitioners covered in their articles.  Rossini's testimony will expand on and elaborate about these and other incidents about which Frankel had no knowledge.  And the few financial documents Petitioners seek from Rossini will likely lead to additional, highly probative evidence regarding payments USG made to individuals or entities associated with the Russian oligarchs and cybersurveillance firms described in Petitioners' articles as well as the source of those funds.

Comparing the parties' relative access to the information also weighs in favor of granting the request, as the information sought is currently unavailable to Petitioners, but within Rossini's control.  *See* Ex. 1 at 7 (instructing Rossini to provide only those documents in his "actual or constructive possession, custody, or control").  The documents Petitioners seek should be easily accessible to Rossini.  And because the request is tailored to only that information relating to specific partners, employees, and clients of USG's, it is not unduly burdensome.  *See id.* at 4, 10 (requesting documents and communications about specific clients, including Deripaska and Rybolovlev); *compare In re Doosan Heavy Indus. & Constr. Co.*, 2020 WL 1864903, at *2 (E.D.N.Y. Apr. 14, 2020) ("[T]he discovery sought is neither burdensome nor intrusive, as it targets only documents and testimony clarifying the nature of the business relationship between Liberty Maritime and KGLPI.").  Nor is there reason to believe that any documents or testimony Petitioners seek would be categorically protected by attorney-client or work product privilege.[6]

---

[6] On August 4, 2022, the Department of Justice indicted Rossini as a co-conspirator in a bribery scheme.  *See* Press Release, U.S. Dep't of Justice, *Former Governor of Puerto Rico Arrested in Bribery Scheme* (Aug. 4, 2022), https://www.justice.gov/opa/pr/former-governor-puerto-rico-arrested-bribery-scheme.  The allegations in Rossini's indictment post-date all relevant events here.  Consequently, the testimony Petitioners seek should not implicate Rossini's Fifth Amendment rights.  *See United States v. Apfelbaum*, 445 U.S. 115, 127 (1980) (stating Fifth Amendment protections apply with respect to matters "that pose substantial and real hazards of subjecting a witness to criminal liability").

In contrast, to deny Petitioners' motion would place an enormous burden on their shoulders. Under English law, a party accused of defamation bears the burden of proving their innocence. Doris Decl. ¶ 27. This is the opposite of American evidentiary presumptions—particularly in defamation cases implicating "public petition and participation," where plaintiffs in New York must prove falsity by clear and convincing evidence. N.Y. Civ. Rights Law § 76-a(d)(2). To shoulder this burden, Petitioners must prove the truth of their statements and debunk Soriano's blanket denials. Doing so requires procuring evidence from sources like Rossini and other Soriano affiliates.

For these reasons, the fourth and final *Intel* factor also strongly weighs in Petitioners' favor.[7]

* * *

Each of the four discretionary *Intel* factors weigh strongly in favor of granting Petitioners' application. Rossini is not a party to the English Defamation Action, English courts are receptive to U.S. discovery assistance, Petitioners do not seek to circumvent any English discovery restrictions with their request, and the discovery sought is neither unduly burdensome nor intrusive. This Court should award Section 1782 relief.

## III. It Is Routine And Proper To Grant Petitioners' Application *Ex Parte*

Section 1782 specifically contemplates and authorizes *ex parte* proceedings. Instead of filing a noticed motion, a party may move *ex parte* for an order directing a third party to produce

---

[7] In any event, the Second Circuit has instructed that even if "a district court finds that a discovery request is overbroad, before denying [a Section 1782] application it should ordinarily consider whether that defect could be cured through a limited grant of discovery." *Mees* 793 F.3d at 302; *see also Euromepa S.A.*, 51 F.3d at 1101 ("[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright."). Consequently, any doubts this Court has as to the scope of the discovery can be addressed in the context of a motion to compel or quash, rather than in this application seeking leave merely to serve Petitioners' proposed subpoena.

documents and to testify at deposition. *See In re Hornbeam Corp.*, 722 F. App'x 7, 10 (2d Cir. 2018) (explaining that the Second Circuit has "decided appeals from motions to quash *ex parte* § 1782 subpoenas without identifying any impropriety in the *ex parte* nature of the § 1782 application"). The third party has the opportunity to respond and to make any objections after the court enters the discovery order. *See Gushlak*, 486 F. App'x at 217 ("The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash."); *Nat'l Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184, 186 (2d Cir. 1999) (describing procedural history including the grant of an *ex parte* application, the service of subpoenas, and respondents' motion to quash); *see also Pfaff v. Deutsche Bank AG*, 2020 WL 3994824, at *14 (S.D.N.Y. July 15, 2020) (granting *ex parte* application with revisions, and ordering respondents to "note any objections to [petitioners'] revised requests within 14 days of their receipt").

Federal district courts—including those in this district—routinely grant Section 1782 applications on an *ex parte* basis. *See, e.g., In re Doosan Heavy Indus. & Constr. Co.*, 2020 WL 1864903, at *1–2; *In re G2A.com SP Z.O.O. (LTD.)*, 412 F. Supp. 3d 145, 146–47 (E.D.N.Y. 2019); *see also Gushlak*, 486 F. App'x at 217 ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."). "Because [Rossini] will have the opportunity to challenge [Petitioners'] subpoenas once served," this Court should grant Petitioners' request for *ex parte* relief. *In re JSC BTA Bank*, 577 F. Supp. 3d at 268.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully requests that the Court grant this Application in its entirety and grant Petitioners leave to serve on Mark Rossini a subpoena substantially similar to that attached as Exhibit A to the Declaration of Anne Champion.

Dated: August 23, 2022

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


*/s/ Anne Champion*
Anne Champion
Lee R. Crain
Erica Sollazzo Payne
Cate McCaffrey
Adam J. Garnick
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone: (212) 351-3883
Facsimile: (212) 351-5303

*Counsel for Petitioners Forensic News LLC and Scott Stedman*